The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Daniel Lee ROLDAN, Defendant–
Appellant.

No. 08CA2487.

Colorado Court of Appeals,
Div. I.

Jan. 20, 2011.

John W. Suthers, Attorney General, Christine C. Brady, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Stephen C. Arvin, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Justice ROVIRA.*

Defendant, Daniel Lee Roldan, appeals the judgment of conviction entered on a jury verdict finding him guilty of theft by receiving. We reverse and remand for a new trial.

## I. Background

In March 2007, Roldan purchased stolen automotive parts valued at $1,600, for which he paid $500. The People charged Roldan with theft by receiving, $500 to $15,000. He pleaded not guilty, and the matter proceeded to trial.

As a prospective juror, Juror R. informed the court in her questionnaire that her husband, brother, and cousin were police officers. In response to a question on her questionnaire asking if there was any reason she believed she could not be fair, she wrote "yes" and explained, "I am very aware of some of the tricks attorn[eys] (especially defense) try to do[,] I would be biased."

During voir dire, she further stated, "I've worked for construction companies that have had things stolen and pawned, and so I think I might be a little biased."

Concerning her relatives in law enforcement she explained, "I love my husband and cops.... I got a lot of friends that are." When asked, "[D]o you think you can be fair and impartial in setting those personal experiences behind?" Juror R. responded, "I think I probably can."

Regarding the credibility of a person with a criminal history, Juror R. stated, "[W]ith the job that my husband and my brother do[ ], that I would be skeptical." She explained, "[M]aybe I'm a little biased in that area, just because of my background like that." When asked, "If somebody walks in

in uniform, are they going to start out as more truthful for you?" Juror R. responded, "Most likely, yeah," and then stated, "[Y]ou just want me to say yes. Yes."

Juror R. also expressed concern for defense attorney "tricks" and for evidence that is "held out of cases just for, you know, various reasons." She stated that she might be concerned that there was other evidence that was not being introduced, which might affect her decision when deliberating. When asked if she could make a fair and rational decision based on all of the evidence and its context, Juror R. responded, "Of course, I would listen to the evidence and make a decision on it, put an opinion on it, but—yeah."

Defense counsel challenged the juror for cause, which the trial court denied. Defense counsel later used a peremptory challenge to remove Juror R. and eventually exhausted all the remaining peremptory challenges.

The jury found Roldan guilty as charged, and the trial court sentenced him to three years of probation. This appeal followed.

## II. Standard of Review

We review a trial court's ruling on a challenge for cause to a prospective juror for an abuse of discretion. *Carrillo v. People*, 974 P.2d 478, 485 (Colo.1999). A reviewing court gives great deference to the trial court's handling of challenges for cause, because such decisions depend on assessing the juror's credibility, demeanor, and sincerity in explaining his or her state of mind. *Morrison v. People*, 19 P.3d 668, 672 (Colo.2000). A trial court has a unique role and perspective in evaluating the demeanor and body language of live witnesses. *Carrillo*, 974 P.2d at 486. "The trial court is in a superior position to evaluate these factors than a reviewing court, which has access only to a cold record for its determination." *Morrison*, 19 P.3d at 672 (citing *People v. Davis*, 794 P.2d 159, 206 (Colo.1990)).

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2010.

### III. Denial of Challenge for Cause to Juror R.

Roldan contends that the trial court abused its discretion by denying his challenge for cause to Juror R., because she held a bias for law enforcement, stated that she might base her opinion of Roldan's guilt on unadmitted evidence, and stated that she was biased because of her experiences with theft. We agree.

The Due Process Clauses of the United States and Colorado Constitutions guarantee a criminal defendant the right to a fair trial. *Morrison,* 19 P.3d at 672. An impartial jury is a fundamental element of the constitutional right to a fair trial. *Id.* (citing *People v. Rhodus,* 870 P.2d 470, 473 (Colo.1994)). A trial court violates a defendant's right to an impartial jury if it fails to remove a juror biased against the defendant. *Id.* (citing *Nailor v. People,* 200 Colo. 30, 32, 612 P.2d 79, 80 (1980)). "A trial court must grant a challenge for cause if a prospective juror is unwilling or unable to accept the basic principles of criminal law and to render a fair and impartial verdict based upon the evidence admitted at trial and the court's instructions." *Id.* If the trial court erroneously denies a challenge for cause, and the defendant removes the juror with a peremptory challenge and exhausts all available peremptory challenges, the judgment of conviction must be reversed and the case remanded for a new trial. *People v. Macrander,* 828 P.2d 234, 244 (Colo.1992).

Relying on *People v. Rogers,* Roland argues that "close association" with the law enforcement establishment requires the dismissal of a prospective juror. 690 P.2d 886, 888 (Colo.App.1984). In that case, however, the reviewing division held that a "combination of factors" resulted in the trial court abusing its discretion when it denied the defendant's challenge for cause to a potential juror. *Id.* The division reasoned that the juror's close association with not only law enforcement, but also the crime scene and a person who attended the victim, resulted in the abuse of discretion. *Id.*

Similarly, in *People v. Reddick,* the reviewing division found that the trial court abused its discretion in denying a challenge for cause of a prospective juror, because a "combination of factors reflecting her close association with the law enforcement establishment required her dismissal for cause." 44 Colo. App. 278, 280, 610 P.2d 1359, 1361 (1980). In that case, the juror knew the prosecutor and a police officer testifying for the prosecution, and her husband was a police officer. *Id.* at 280, 610 P.2d at 1360. The reviewing division reasoned that

> [d]espite her somewhat ambivalent statements that these factors would not affect her ability to be a fair and impartial juror, the possible unconscious influence of her respect for the prosecutor and her relationship with police officers was such as to have significant impact on [the] defendant's right to an impartial jury.

*Id.* at 280, 610 P.2d at 1361.

In addition to considering a "combination of factors," courts assess a juror's impartiality based on his or her statements during voir dire. In *People v. Prator,* the reviewing division held that the trial court abused its discretion when it denied a challenge for cause to a prospective juror, because the juror's response to questions on voir dire "indicated a clear expression of bias" in favor of law enforcement witnesses. 833 P.2d 819, 820 (Colo.App.1992), *aff'd,* 856 P.2d 837 (Colo.1993). The prospective juror's son, husband, and father-in-law were all involved in law enforcement. *Id.* at 821. When asked if she could decide the case solely upon the evidence and the law, regardless of her family members' involvement in law enforcement, the juror ambiguously answered, "I would like to believe I could do that." *Id.* Regarding bias in favor of law enforcement testimony, the juror stated, "I would like to think that I would be a fair and honest person, but if you put two people side by side, and one has a police officer's uniform, I would be prone to listen to the police officer." *Id.* Furthermore, the juror "really" doubted her ability to listen to testimony with impartiality, and she stated that she thought she would "end up" being biased. *Id.* The trial court denied the defendant's challenge for cause, and neither the prosecution nor the court made any attempt to reha-

bilitate the juror. *Id.* The reviewing division held that the trial court abused its discretion in denying the defendant's challenge for cause. *Id.*

In contrast, a trial court did not abuse its discretion in denying a defendant's motion to dismiss a juror for cause where that juror's brother was a police officer, because the juror unequivocally stated that he could be fair and impartial to the parties. *People v. Vigil,* 718 P.2d 496, 501 (Colo.1986). The juror stated that his brother's position might "subconsciously" affect him, but assured the court that he would follow the court's instructions on credibility and could be fair and impartial to both sides. *Id.*

Similarly, a reviewing division concluded that evidence supported a finding that a juror could be impartial, despite the juror's close association with law enforcement, including having a sheriff brother-in-law and friends in law enforcement. *People v. Richardson,* 58 P.3d 1039, 1043 (Colo.App.2002). The juror stated that he would "possibly" believe a police officer's testimony over another citizen's, but indicated that his personal relationships would not interfere with his ability to render a fair and impartial verdict. *Id.*

■ Here, the record does not support the trial court's decision to deny a challenge for cause to Juror R. because of a combination of factors, including close association with law enforcement and her statements on voir dire. The single factor that Juror R.'s husband, brother, and cousin were police officers was insufficient to require her dismissal as a prospective juror. *Vigil,* 718 P.2d at 501; *Richardson,* 58 P.3d at 1043; *Rogers,* 690 P.2d at 888. However, a combination of factors indicates that Juror R. demonstrated a "clear expression of bias" in favor of law enforcement witnesses and was unable to render an impartial verdict. *Prator,* 833 P.2d at 820–21.

Unlike the juror in *Richardson,* who stated that he would "possibly" believe a police officer's testimony over another person's, Juror R. stated that she would "most likely" accept a police officer's statements as more truthful than another person's. *Richardson,* 58 P.3d at 1043. Regarding the credibility of a per-

son with a criminal history, Juror R. stated that such persons have "less credibility" and that "[she] would be skeptical." She referred to her potential for bias twice, stating, "[M]aybe I'm just a little biased in that area, just because of my background like that," and that as the victim of theft, she "might be a little biased" in reaching a verdict in this case.

Further, Juror R.'s statement that she could "probably" be fair and impartial did not qualify as an unequivocal, rehabilitating statement. Juror R. failed to expressly state that her relationships with law enforcement would not interfere with her ability to hold the prosecution to its burden, or that she would be fair and impartial with both parties. *See id.* When asked if she could be a fair and impartial juror despite close associations with law enforcement, Juror R. vaguely answered, "I think I probably can."

When asked if she could make a fair and rational decision based on all of the evidence and its context, Juror R. ambiguously stated, "Of course, I would listen to the evidence and make a decision on it, put an opinion on it, but—yeah." The record suggests that Juror R. doubted her capacity for fairness, similarly to the juror *Prator* who "really" doubted her impartiality and who expressly stated that she thought she would "end up" being biased. 833 P.2d at 821. Like the juror in *Reddick,* Juror R.'s statements that she could serve as a fair and impartial juror were "ambivalent" at best, and the record suggests that her relationship with law enforcement and her experiences with theft would have a "significant impact" on Roldan's right to an impartial jury. *See Reddick,* 44 Colo. App. at 280, 610 P.2d at 1361. Furthermore, Juror R. expressed concern for defense attorney "tricks" and for evidence that is "held out of cases just for, you know, various reasons."

Thus, Juror R.'s opinion on police officer testimony, combined with her express statements that she might be "biased," as well as answering a query of her capacity for fairness and impartiality as a juror with, "I think I probably can," do not support the trial court's denial of Roldan's challenge for cause.

Accordingly, the trial court abused its discretion when it denied the challenge for cause of the prospective Juror R.

The judgment is reversed and the case is remanded for a new trial.

Judge CASEBOLT concurs.

Judge BERNARD specially concurs.

Judge BERNARD specially concurring.

Because I am bound by our supreme court's jurisprudence in this area, I must agree with the majority's holding that defendant's conviction has to be reversed. *See People v. Smith,* 183 P.3d 726, 729 (Colo.App. 2008) (Colorado Court of Appeals is bound by decisions of Colorado Supreme Court). The conviction must be reversed because the trial court erred when it did not grant defendant's challenge for cause to Juror R. I write separately to express my hope that our supreme court will review this case to decide whether this strict remedy of automatic reversal in these circumstances should be replaced by a remedy based on harmless error analysis.

This case presents a common scenario. A defendant challenges a juror for cause, and the trial court denies the challenge. The defendant then exercises a peremptory challenge, removing that juror and exhausts all the allotted peremptory challenges.

If we conclude that the trial court's denial of the challenge for cause was erroneous, we must, in such cases, reverse the defendant's conviction. *See People v. Macrander,* 828 P.2d 234, 242–44 (Colo.1992). We must do so even if there is no indication in the record that any juror who actually deliberated was biased or partial, which means that we must do so even if—as I believe to be the case here—defendant received the fair trial by a fair and impartial jury that the Constitution guaranteed him.

I respectfully submit that the existing remedy for this error is unnecessarily absolute and an artifact of a bygone era. Our law concerning harmless error has evolved significantly since our supreme court first adopted this remedy. If the court were writing on a clean slate today, I am convinced that it would reach a different conclusion in light of significant authority supporting a different remedy. As it is, Colorado is one of a rapidly dwindling number of states that still requires the remedy of automatic reversal for such errors.

Other judges on this court have previously raised various concerns about this remedy. Two have done so in published opinions. *See People v. Novotny,* —— P.3d ——, —— (Colo. App.2010) (Connelly, J., specially concurring); *People v. Merrow,* 181 P.3d 319, 322–23 (Colo.App.2007) (Webb, J., specially concurring). Two others, Judge Furman and Judge J. Jones, have done so in unpublished opinions. I write to add my voice to theirs.

### I. Origins of the Automatic Reversal Remedy

#### A. The Genesis of Colorado's Remedy

As early as 1885, our supreme court held that it would not reverse a conviction in which the trial court had erroneously denied the defendant's challenge for cause to a juror because the defendant did not also exhaust his peremptory challenges. *Minich v. People,* 8 Colo. 440, 449, 9 P. 4, 10 (1885). This holding implied that if all peremptory challenges had been exhausted, the conviction would have been reversed. At that time, such a result was automatic in many other states when all peremptory challenges had been used. *E.g., State v. Brown,* 15 Kan. 400 (1875).

What was implicit in 1885 became explicit in 1911. In *Denver City Tramway Co. v. Kennedy,* 50 Colo. 418, 423, 117 P. 167, 169 (1911) (*Kennedy*), the supreme court expressed the rationale for the remedy of automatic reversal that we apply today:

> Here a right given the defendant by statute was denied. The injury complained of was the denial of a statutory right. That is the error the court committed, and that is the injury complained of, the result of which compelled the defendant to exhaust one of its peremptory challenges on this juror when it was entitled to have him excused without so doing. This left the defendant one less peremptory challenge to be used upon others.... Had the objection been sustained, the personnel of the

jury would have been different. As to what effect this might or might not have had upon the ultimate result of the trial is a matter of pure conjecture and is not for the trial court, or even this court, to make a guess at.

In other words, a defendant in Colorado has an "absolute right" to "the use of all peremptory challenges granted him by statute," and, if this right is denied by a court's erroneous ruling, there will be reversible error "because the jury so forced upon the [defendant] is not a statutory tribunal." *Harris v. People*, 113 Colo. 511, 520, 160 P.2d 372, 377 (1945). Our supreme court characterized *Kennedy*'s reasoning as "unassailable" in criminal cases. *Macrander*, 828 P.2d at 243.

### B. The Exchequer Rule

However, *Kennedy* was decided during a time when the general analysis of error in criminal cases was significantly different than it is today. Many states had adopted the so-called Exchequer Rule, under which even slight errors created a presumption of prejudice that almost mechanically required reversal. *See State v. Rodriguez*, 254 S.W.3d 361, 368 (Tenn.2008); *see also* William T. Pizzi & Morris B. Hoffman, *Jury Selection Errors on Appeal*, 38 Am.Crim. L.Rev. 1391, 1419–20 (2001). One prominent commentator, writing in 1919, described how the Exchequer Rule worked.

> Of course all courts go so far as to deny a new trial if the error *could not* have been prejudicial; and all would grant a new trial if it is affirmatively shown that the error *must* have been prejudicial. Under the prevailing [Exchequer] [R]ule in this country, in the absence of a statute, it is held that a new trial will be granted if the error *might* have been prejudicial.

Austin W. Scott, *The Progress of the Law, 1918–1919 Civil Procedure*, 33 Harv. L.Rev. 236, 250 (1919).

Under the Exchequer Rule, many criminal convictions were reversed for reasons that we would deem trivial, insignificant, or technical today. For example, "convicted murderers [were granted] new trials because of the misspelling of non-essential words or oth-er typographical errors in the indictment, or minor and inconsequential evidentiary errors at trial." Roger A. Farifax, Jr., *A Fair Trial, Not a Perfect One: The Early Twentieth–Century Campaign for the Harmless Error Rule*, 93 Marq. L.Rev. 433, 436 (Winter 2009).

The Exchequer Rule turned trials into sporting events in which the goal was to sow the record with reversible error. *Kotteakos v. United States*, 328 U.S. 750, 759, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Many convictions were reversed, only to endure "the same matching of wits" on retrial. *Id.* At the beginning of the twentieth century, American appellate courts were seen as "tower[ing] above the trials of criminal cases as impregnable citadels of technicality." *Id.* (quoting Marcus A. Kavanagh, *Improvement of Administration of Criminal Justice by Exercise of Judicial Power*, 11 A.B.A. J. 217, 222 (1925)).

Whether Colorado has explicitly followed the Exchequer Rule is unclear because specific reference to it does not appear in any published Colorado case. On the one hand, there are hints that the Exchequer Rule was applied in some situations, or at least considered. *See, e.g., Painter v. Wilcox*, 52 Colo. 639, 642, 125 P. 503, 504 (1912) ("It has frequently been held that error will be presumed prejudicial unless it is made to affirmatively appear that it is not. This rule, however, is not universal."); *Denver City Tramway Co. v. Cowan*, 51 Colo. 64, 74, 116 P. 136, 140 (1911) ("Presumably every error is prejudicial to the party against whom it is committed, and the presumption cannot be overcome until it appears, beyond doubt, that the error . . . could not have prejudiced the party's rights."); *Fisher v. Denver Nat'l Bank*, 22 Colo. 373, 377, 45 P. 440, 442 (1896) ("Whether the presumption be that prejudicial error resulted from the wrong ruling, or that the record must affirmatively show that such ruling resulted in prejudice to the defeated party. . . ."); *Lothrop v. Roberts*, 16 Colo. 250, 252, 27 P. 698, 699 (1891) ("prejudice will generally be presumed" when the trial court did not allow counsel "fullest latitude" to cross-examine witness); *Denver, S.P. & P.R. Co. v. Wilson*, 12 Colo. 20, 26, 20

P. 340, 343 (1888) ("It is impossible to say that the admission of this [expert] testimony was error without prejudice; it may have been the very thing that induced the jury to find negligence on the part of defendant.").

On the other hand, as early as 1907, Colorado's legislature passed. a statute stating that a criminal conviction should not be reversed because of certain variances between the charging document and the proof at trial unless the defect "tend[ed] to prejudice the substantial rights of the defendant on the merits." Ch. 163, sec. 1, 1907 Colo. Sess. Laws 353–54. This statute partially prefigured our present rule of criminal procedure concerning harmless error—Crim. P. 52(a) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.")—that was adopted in 1961. *See People v. Baenziger*, 97 P.3d 271, 274 (Colo.App.2004) (Colorado Rules of Criminal Procedure were adopted in 1961).

## II. Harmless Error Analysis: A Product of Reform

### A. First Steps

The problems generated by the Exchequer Rule prompted a reform movement. In 1919, Congress adopted a "harmless error" statute that instructed federal appellate courts to disregard "technical errors, defects, or exceptions which do not affect the substantial rights of the parties." Act of Feb. 26, 1919, 40 Stat. 1181, 28 U.S.C. § 391. Many states quickly followed suit, adopting harmless error analysis by legislation or judicial action. *Kotteakos*, 328 U.S. at 759 n. 12, 66 S.Ct. 1239. The purpose of these reforms, which incorporated harmless error review into the national legal lexicon, was

> to substitute judgment for automatic application of rules [and] to preserve review as a check upon arbitrary action and essential unfairness in trials, but at the same time to make the process perform that function without giving men fairly convicted the multiplicity of loopholes which any highly rigid and minutely detailed scheme of errors, especially in relation to procedure,

will engender and reflect in a printed record.

*Kotteakos*, 328 U.S. at 760, 66 S.Ct. 1239.

### B. The Evolution of Harmless Error Analysis

Even assuming that, when *Minich* and *Kennedy* were decided, Colorado's case law was not directly influenced by the Exchequer Rule, and that some form of harmless error analysis was embedded in Colorado's law of appellate review, the analysis of whether an error is harmless was far different then than it is now. As of 1885, or even 1911, the cases that presently inform our harmless error analysis did not exist and would not come into being for many years.

*Kotteakos*, which established the harmless error test for nonconstitutional errors, was decided in 1946. *Chapman v. California*, 386 U.S. 18, 24–25, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which addressed the harmless error test for preserved constitutional errors, was issued twenty-one years later. The distinction between structural errors and trial errors, and their different treatment under harmless error analysis, was articulated twenty-four years after *Chapman* in *Arizona v. Fulminante*, 499 U.S. 279, 306–07, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). *See also Neder v. United States*, 527 U.S. 1, 7–8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (structural errors require automatic reversal).

The tests that these cases establish are by now familiar. Nonconstitutional error requires reversal only if the error substantially and injuriously affects or influences the jury's verdict. *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239. Properly preserved constitutional error requires reversal unless the prosecution can establish, beyond a reasonable doubt, that the error did not contribute to the verdict. *Chapman*, 386 U.S. at 24, 87 S.Ct. 824. We know that most errors are trial errors, subject to harmless error review, but that a few errors are structural, which require automatic reversal. *Neder*, 527 U.S. at 7–8, 119 S.Ct. 1827; *Fulminante*, 499 U.S. at 306–07, 111 S.Ct. 1246.

### III. The Remedy of Automatic Reversal and Harmless Error

#### A. The Error Is Not Structural Error

In my view, the remedy of automatic reversal treats the jury selection error at issue here as a form of structural error because there is no evaluation whether the error was harmless. However, I respectfully submit that it does not meet the definition of structural errors established in *Fulminante*. Such errors are

> structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards.... [They affect] the framework within which the trial proceeds, rather than simply [constitute] an error in the trial process itself. "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair."

*Id.*, 499 U.S. at 309–10, 111 S.Ct. 1246 (quoting *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)).

However, as Professor Pizzi and Judge Hoffman persuasively demonstrate, the error that prompts the remedy of automatic reversal in this context does not fit this definition. *Jury Selection Errors on Appeal*, 38 Am. Crim. L.Rev. at 1428–33. This is so because such errors do not affect the reliability of a trial truth-finding function and because the impact of such errors can be rationally determined. Several reasons support this conclusion.

First, peremptory challenges *should* be used to correct trial court errors in denying challenges for cause. The use of a peremptory challenge "to effect an instantaneous cure of the [trial court's] error" in denying a challenge for cause "exemplifies 'a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury.'" *Skilling v. United States*, 561 U.S. 358, 395 n. 31, 130 S.Ct. 2896, 2923 n. 31, 177 L.Ed.2d 619 (2010) (quoting *United States v. Martinez–Salazar*, 528 U.S. 304, 316, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000)); *see also Jury Selection Errors on Appeal*, 38 Am.Crim. L.Rev. at 1406, 1428–37 (challenges for cause and peremptory challenges complement one another in protecting a defendant's right to an impartial jury).

Second, the error in cases like this one is not constitutional because peremptory challenges are "creature[s] of statute and are not required by the Constitution." *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *see also Rivera v. Illinois*, 556 U.S. 148, 156, 129 S.Ct. 1446, 1453, 173 L.Ed.2d 320 (2009) ("[T]here is no free-standing constitutional right to peremptory challenges.... [A] State may decline to offer them at all."); *Martinez–Salazar*, 528 U.S. at 311, 120 S.Ct. 774 (peremptory challenges are "auxiliary" and "are not of federal constitutional dimension").

Third, the United States Supreme Court has made clear that no federal constitutional error occurs when a defendant uses a peremptory challenge to remove a juror who should have been removed for cause, as long as no other biased juror is a member of the jury. *Martinez–Salazar*, 528 U.S. at 314, 120 S.Ct. 774. And, as Professor Pizzi and Judge Hoffman recognize, "[h]ow can it be said that the reliability of a trial is likely to be compromised when a defendant loses a single peremptory challenge, but when all the jurors who actually hear the case are fair and impartial?" *Jury Selection Errors on Appeal*, 38 Am.Crim. L.Rev. at 1433. The mere fact that the jury would have been differently constituted is not alone a reason to assume that this second jury would have been, or could have been, *more* fair. *See id.*

In contrast, harmless error analysis would ask the question whether the defendant has demonstrated that he or she was prejudiced by the error. This would require the defendant to show that a member of the jury that deliberated in his or her case was biased. *See, e.g., Martinez–Salazar*, 528 U.S. at 311, 120 S.Ct. 774; *State v. Menzies*, 889 P.2d 393, 398 (Utah 1994).

#### B. Colorado's Recent Experience

*Ross*, decided in 1988, and *Martinez–Salazar*, decided in 2000, held that the remedy of automatic reversal was not constitutionally required. After *Ross* was decided, our

supreme court declined to apply it in *Macrander*. The court, reaffirming the remedy established in *Kennedy*, stated that the prosecution's reliance on *Ross* was misplaced for two reasons. Initially, the court stated that the issue in *Macrander* was not whether, as in *Ross*, the jury was impartial in a "constitutional sense," but whether the trial court's erroneous denial of a challenge for cause affected one of the defendant's substantial rights. *Macrander*, 828 P.2d at 244 n. 12. Then, the court observed that the Oklahoma practice analyzed in *Ross* required defendants to demonstrate that a biased juror was a member of the jury in their cases in order to gain appellate relief. Colorado does not require this step. *Id.*

After *Martinez–Salazar* was decided, our supreme court again reaffirmed the *Kennedy* remedy in *People v. Lefebre*, 5 P.3d 295, 307–08 (Colo.2000). The court held that the holdings in *Ross* and *Martinez–Salazar* were "narrow" and had "little application" to the case before it. *Lefebre*, 5 P.3d at 307. As part of its analysis, the court (1) referred to the long history of the *Kennedy* remedy in Colorado; (2) stated that defendants who have suffered the type of error we address here suffer a Fourteenth Amendment due process violation; (3) noted that Colorado is free to adopt its own remedies in this area; and (4) listed four states—Arizona, Kentucky, Washington, and Wisconsin—that also apply the remedy of automatic reversal in these circumstances.

## C. Reasons Why the Remedy of Automatic Reversal Should Be Replaced by Harmless Error Analysis

Certainly, states are free to choose their remedies in this area. *See Rivera*, 556 U.S. at 161–62, 129 S.Ct. at 1456 ("Absent a federal constitutional violation, States retain the prerogative to decide whether such errors deprive a tribunal of its lawful authority and thus require automatic reversal."). However, the thoughtful work of Professor Pizzi and Judge Hoffman provides compelling reasons why our supreme court should reconsider the *Kennedy* remedy in light of the harmless error analysis discussed in *Ross, Martinez–Salazar, Rivera,* and *Skilling*.

Further, the remedy of automatic reversal is quickly losing adherents in other states in light of these United States Supreme Court decisions. Of the four states mentioned in *Lefebre*, three have now abandoned the remedy of automatic reversal, even though it had long been entrenched in those jurisdictions. *See State v. Hickman*, 205 Ariz. 192, 194–201, 68 P.3d 418, 420–27 (2003); *State v. Fire*, 145 Wash.2d 152, 157–165, 34 P.3d 1218, 1221–25 (2001); *State v. Lindell*, 245 Wis.2d 689, 717–50, 629 N.W.2d 223, 236–52 (2001).

Of those three states, each had previously held, similar to our supreme court's holding, that automatic reversal was the proper remedy because

> [r]eversal is the only feasible way to vindicate a party's 'substantial right' to peremptory challenges, which right is clearly impinged when a trial judge erroneously denies a challenge for cause.

*State v. Huerta*, 175 Ariz. 262, 266, 855 P.2d 776, 780 (1993), *overruled by Hickman*, 205 Ariz. at 201, 68 P.3d at 427; *see also Fire*, 145 Wash.2d at 160, 34 P.3d at 1222–23 (overruling Washington's automatic reversal remedy, which was based on the rationale that "[e]ven though … no biased juror was seated, the prejudice occurs in the deprivation of one peremptory challenge to which a defendant is entitled"); *Lindell*, 245 Wis.2d at 718, 629 N.W.2d at 236 (overruling Wisconsin's automatic reversal remedy, which was based on the rationale that using a peremptory challenge to correct the trial court's error in denying a challenge for cause justified reversal because it arbitrarily deprived the defendant of a statutory right).

The fourth state, Kentucky, has vacillated. It decided to follow the United States Supreme Court precedent in this area, but then it returned to the remedy of automatic reversal. *Compare Morgan v. Commonwealth*, 189 S.W.3d 99, 103–07 (Ky.2006) (rejecting automatic reversal remedy), *with Shane v. Commonwealth*, 243 S.W.3d 336, 338–42 (Ky. 2007) (reinstating automatic reversal remedy).

Presently, at least twenty-nine states and the United States do not employ the remedy of automatic reversal, but, instead, require a

defendant to show prejudice—namely, that a biased juror actually sat on the jury—in order to gain appellate relief. *See Martinez–Salazar,* 528 U.S. at 311, 120 S.Ct. 774; *People v. Rivera,* 227 Ill.2d 1, 15–22, 316 Ill.Dec. 488, 879 N.E.2d 876, 884–88 (2007); *Kopsho v. State,* 959 So.2d 168, 175 n. 3 (Fla.2007) (Bell, J., concurring) (listing cases).

Moreover, the United States Supreme Court held in 2009 that, when all the jurors who deliberate in a case have been passed for cause and are unbiased, the Fourteenth Amendment's Due Process Clause does not require automatic reversal of a defendant's conviction even though a trial court erroneously denies a challenge for cause. *Rivera,* 556 U.S. at 156–61, 129 S.Ct. at 1453–55. In reaching this result, the Court observed that the trial court's error of state law was not "constitutionally significant" because "errors of state law do not automatically become violations of due process." *Id.*

Last, the Supreme Court recognized that language from *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), has been cited as a basis for the remedy of automatic reversal. There, the Court stated that the "denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice." *Id.* However, in *Martinez–Salazar,* the Court made emphatically clear that this language "was not only unnecessary to the decision" in *Swain,* but "was founded on a series of our early cases decided long before the adoption of harmless-error review." *Martinez–Salazar,* 528 U.S. at 317 n. 4, 120 S.Ct. 774. The Court has, therefore, disavowed this language from *Swain. Rivera,* 556 U.S. at 159–62, 129 S.Ct. at 1455–56.

### IV. Conclusion

As our supreme court recognized in *Creacy v. Industrial Commission,* 148 Colo. 429, 433, 366 P.2d 384, 386 (1961), the important concept of stare decisis is not an absolute bar to change:

> The rule of stare decisis is not a doctrine of mortmain; it does not exclude room for growth in the law and the courts are not without power to depart from a prior ruling, or to overrule it, where sound reasons

exist and where the general interests will suffer less by such departure than from a strict adherence.

I understand that, if our supreme court were to discard the remedy of automatic reversal, it would likewise discard years of precedent. However, by doing so, the court would rely on "sound reasons" and promote the "general interest." *See Hickman,* 205 Ariz. at 201, 68 P.3d at 427 (concluding that there were "sufficiently compelling" reasons to dispense with stare decisis and overrule prior case law requiring the remedy of automatic reversal). This is so because the supreme court would align Colorado's jurisprudence in this area with the harmless error jurisprudence that it consistently employs, and has consistently employed for years, when resolving criminal procedure issues. *See, e.g., Luu v. People,* 841 P.2d 271, 273–75 (Colo.1992) (applying *Fulminante* ); *People v. Incerto,* 180 Colo. 366, 374–75, 505 P.2d 1309, 1313 (1973) (applying *Kotteakos* ); *Larkin v. People,* 177 Colo. 156, 161, 493 P.2d 1, 3 (1972) (applying *Chapman* ).